No. 13833

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

IN RE:  EUGENE H. MARTEN

---

ORIGINAL PROCEEDING:

Counsel of Record:

    For Appellant:

        William Hutchison argued, Helena, Montana
        William J. Miele, Miles City, Montana

    For Respondent:

        Honorable A. B. Martin argued, District Judge,
          Miles City, Montana

---

Submitted:  June 10, 1977

Decided: NOV - 2 1977

Filed: NOV

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court:

This is an original proceeding by a 17 year old male youth seeking a writ of habeas corpus, supervisory control, or other appropriate relief to test the legality of proceedings leading to his detention over a weekend in May 1977, in the juvenile part of the Custer County jail in Miles City, Montana.

The thrust of the youth's petition is that he was unlawfully incarcerated in that: (1) He was denied the assistance of counsel, and (2) he was incarcerated in jail by failure of the Youth Court judge to follow the statutory procedures and requirements of the Montana Youth Court Act.

The principal facts concerning the youth are contained in the report of Donald P. Wright, youth probation officer of the Sixteenth Judicial District, to the district court and set out verbatim here:

"At approximately 12:00 Noon, on the 20th day of May, 1977, Gene Marten, a youth under the age of eighteen years, was referred to me charged with being in possession of stolen property, 94-6-302(3C), of the Revised Code of Montana, 1947 as amended, by the Rosebud County Sheriff's Department.

"Gene is a seventeen year old youth who is living with the Lovells in Forsyth. This home is not a licensed foster home. His father, Eugene Marten, whose last known residence was in Great Falls, Montana, is unavailable and I have not been able to contact him to date. I contacted the Cascade County Probation Office and they were unable to contact Mr. Marten, however, they did talk to the boy's grandparents, who stated that they believed that Mr. Marten had left Great Falls.

"Mr. Dan Lovell stated that Gene's father was going to be coming through the town of Forsyth sometime over this weekend, and that Mr. Marten was going to stop by the Lovell residence while in Forsyth.

"Gene Marten was under the supervision of the Children's Services Office in Rosebud County until approximately one month ago. Presently, he has no legal guardian in Forsyth and the whereabouts of his father are unknown.

"I believe and it is my opinion that it is in Gene Marten's best interests to be held in custody until such time as a hearing can be held before the District Judge of the 16th Judicial District Youth Court.

"At noon today, when Gene was referred to my office, there was no available space in the juvenile portion of the Rosebud County jail. The county attorney, John Forsyth, and District Judge A.B. Coate were tied up in a jury trial and I transported Gene Marten to Miles City, Montana under the authority of the Montana Youth Court Act, Section 10-1212, to be placed in the juvenile portion of the Custer County jail pending a petition being filed and a subsequent hearing before the District Youth Court Judge."

Following the youth's transfer to Miles City, the Youth Court judge, the Hon. A.B. Martin, held a hearing, a transcript of which is before this Court. In the middle of this hearing, an attorney from Montana Legal Services appeared and requested the right "to say something". The following is a verbatim transcript of what occurred following the appearance of the Legal Services attorney at the hearing:

"MR. MIELE: Your Honor, if I could say something please.

"THE COURT: Well, I'm going to make an order and then I'll let you say it.

"MR. MIELE: I'd like to say it before the order, because I'm sure it's relevant.

"THE COURT: I'm going to run this and then you can say whatever you want to. Now you prepare this order, Jim, and it will be to this effect.

"The Honorable Alfred B. Coate, presiding Youth Court Judge of Rosebud County, being elsewhere occupied on judicial business, the written report and sworn testimony of Don Wright, Juvenile Probation Officer of Rosebud County, has submitted to the undersigned Youth Court Judge of the Sixteenth Judicial District of Miles

- 3 -

City, Montana, and it appearing from said report that the -- and the testimony submitted, that

"1. There is probable cause to believe that said juvenile has committed the offense of being in possession of stolen property.

"2. That the parents of said child cannot be reached at the present time, and that there is no home or institution in which said youth can temporarily be detained pending further proceedings,

"Now Therefore it is Ordered that Donald P. Wright, a Juvenile Officer, may take custody of said juvenile and detain him in the Custer County jail, pending the filing of a formal petition by the County Attorney of Rosebud County. Such detention not to exceed five days, and the County Attorney shall forthwith file said formal petition.

"It Is Further Ordered, that J. Dennis Corbin, attorney of Miles City, Montana, be appointed as said youth's attorney, who will as soon as reasonably possible, contact said youth and attend to the protection of his legal rights.

"MR. MIELE: May I make a statement on the record?

"THE COURT: All right.

"MR. MIELE: First of all, Gene contacted my office yesterday in regard to the representation of Gene, and I have stated to him that I would represent him. Second of all, in regard to the statement that there is no available home, I don't think that is entirely accurate. We have a worker here from the Child Abuse Project in Rosebud County, who could state that the child has been living in a family home, that the child has been there for some period of time, and that the person who is in charge of that home, is ready, willing and able to come forward and give assurances in accordance with RCM 10-1213, that the child will be present in court on Monday, or whatever time is set for the hearing. Another matter which I don't know if it's legal, but I question the ethics of it, is the fact that I talked to Mr. Wright this morning, or this afternoon and told him that I was looking into the fact that the boy was in jail, and that I would be in touch with him this afternoon, and that there is a good chance that I would bring a habeas corpus petition before this court to have the boy let out, and I just question the ethics of him coming up here without notifying me when he knows that I was representing the boy.

"THE COURT: He advised me that you had talked with him, so I know about that, and I have appointed an attorney for him, and if you want to talk to his attorney go ahead.

- 4 -

"MR. MIELE: Is the Court interested in hearing any of the testimony that we can offer?

"THE COURT: No, I'm not. That's it, the order is signed. You prepare that order forthwith and you will see that he gets a copy.

"MR. WRIGHT: Yes, Your Honor.

"THE COURT: And you make a copy of the minutes and send it over, if you can, with Don Wright when he returns, and then we'll let Judge Coate handle this thing, and I imagine it will be handled Monday.

"MR. WRIGHT: Yes, Your Honor.

"THE COURT: And if anyone else wants to appear, we'll let Judge Coate handle it.

"MR. WRIGHT: Your Honor, the home that the boy has been staying in, is not a licensed foster home, and the same portion of the youth court statute stated by Mr. Miele, also states that the boy shall or will be held in a home authorized by the Court, if there is no parents or guardian present, and this was not a licensed foster home.

"MR. MIELE: I might point out 10-1212, where it states that if the child has no parent, guardian or other person able to provide supervision and care for him and return him to the court when required, and I don't see any requirement of a licensed home.

"THE COURT: Well you seem to overlook the fact that the Juvenile Court and the Juvenile Officers are attending to the interest of this child, as well as that of society. Furthermore, the Court has taken the necessary action to protect the legal rights of this boy, and I think that is all that is necessary."

On May 23, 1977, Montana Legal Services Association filed an original proceeding in this Court for a writ of habeas corpus, supervisory control or other appropriate relief accompanied by affidavits of Daniel Lovell, Eugene Herman Marten, the youth involved, Marsha McDede and William J. Miele, the Legal Services attorney, together with a brief in support of the petition.

This Court ordered an adversary hearing. Prior to the adversary hearing, Judge Martin filed his response to the petition which we set forth verbatim:

- 5 -

"The response ordered by the Supreme Court to
the petition for writ of habeas corpus or other
appropriate relief filed in the above entitled matter
is herewith submitted in narrative form without argu-
ment. What is said is my recollection of events
leading up to the peremptory order for temporary deten-
tion of the youth.

"Mr. Donald Wright who is the resident juvenile
officer of Rosebud County came to my office on Friday
afternoon, May 20, 1977, explaining that he had a
problem which Judge Coate or the County Attorney could
not act upon because they were presently occupied with
a jury trial. To the best of my recollection Mr. Wright
gave the following background.

"The father and mother of the Marten boy had been
divorced in Idaho. The father had been awarded custody
of the children but had subsequently been deprived by
court order of the two younger children because of abuse
and neglect. In some manner not clear to me, Eugene
Marten was taken under the wing of a federal agency which
Mr. Wright referred to as 'Childrens Service.' I had
never heard of this agency and was advised that it was
a federally funded agency which was being tested in
selected communities throughout the United States.
Apparently it duplicates or augments the service pro-
vided by the State of Montana for abused and neglected
children, but acts independently from the Montana De-
partment of Social and Rehabilitation Services. I note
from affidavits of petitioner that the official title
of the agency is 'Rosebud County Northern Cheyenne
Child Abuse and Neglect Project.'

"The Marten youth was placed in a foster home by
the Agency in Forsyth, Montana, but declined to follow
the rules and regulations imposed by that home. Be-
cause of the differences he was having with his foster
parents, he moved into a home of a friend by the name
of Dan Lovell. This move was given the after the fact
blessing of the agency. It was during this period of
his residency that the stolen tires and wheels were found
in his possession. Mr. Wright, in my opinion, rightfully
took the position that with the apparent criminal violation,
the juvenile probation department should take control
of the situation. It was also his position that the
Lovell home was not a licensed foster home and under the
circumstances described by him, was not a suitable home
for detention of the boy pending further investigation
and hearing on the youth's detention. It was to this home
that Mr. Miele believed the youth should be returned.

"Mr. Wright made an effort to contact the youth's
father. He had called the juvenile probation office in
Great Falls, who in turn contacted the youth's grand-
parents who did not know where the father was, but
believed he had gone 'somewhere east' looking for a job.

- 6 -

"With this information I directed Mr. Wright to
file a written report stating in substance what
he had related, together with a request to file a
petition alleging juvenile delinquency. He was
then to return with the youth and give oral testi-
mony. This was done but during the course of the
testimony, Mr. Miele came striding into the office
with a train of attendants who stood in the doorway
while Mr. Miele gave the appearance of wanting to
interrupt. I said nothing and as Mr. Miele lis-
tened he started shaking his head, pulling his beard,
turning one direction, then the other, and looking
back at the people behind him whose smiles implied
they understood Mr. Miele's dilemma.

"My irritation with this display was aggravated
by accounts of previous confrontations that Mr.
Miele had had with the juvenile probation officers.
As related by Mr. Butz, Mr. Miele, on one occasion
stormed uninvited into the juvenile probation office
and in an imperious manner issued ultimatums as to
what the officers could or could not do. This con-
frontation reached the point that they were ready to
bodily eject Mr. Miele from the office.

"On another occasion Mr. Wright was attempting
to explain to Mr. Miele, Mr. Wright's handling of a
certain juvenile. Mr. Miele insolently swung around
and sat with his back to Mr. Wright.

"I have the greatest confidence in Mr. Wright.
He is not combative and goes about his work in a
quiet and thorough manner. If Mr. Miele would appear
as a friend, rather than a dictator, the court and its
juvenile officers would respond accordingly.

"I observed when the Marten youth appeared that
he was a mature 17 year old youth. The juvenile
detention quarters of the Custer County Jail was
constructed about three years ago and adequate quarters
are available for the detention and supervision of
juveniles. After ordering that he be confined, I
directed Mr. Wright to see that the court appointed
counsel was immediately put in touch with the boy,
which I am advised was prmptly done.

"Considering the totality of the circumstances,
the court and its juvenile officers acted within the
spirit and the letter of the law."

Accompanying the district court's response was the affidavit

of the youth probation officer, with a copy of his report to

the court attached.

Another affidavit of the youth, together with a copy of

Judge Coate's order transferring the case to Lewis and Clark

County was attached.

Petitioner sets forth two issues for this Court's consideration:

1. Did the Youth Court err in denying the assistance of available counsel to the youth in the predetention hearing before Judge Martin?

2. Did the Youth Court fail to follow the statutory requirements and procedures of the Montana Youth Court Act in ordering the prehearing detention of Eugene Marten in the Custer County jail?

At the outset, we are confronted with a contention the issues raised in this proceeding are moot as the youth is no longer incarcerated and is living with the Lovell family in Forsyth. While it may be true a writ of habeas corpus is no longer available to test the legality of the youth's confinement, the application for supervisory control to test the legality of the proceedings leading to such confinement is by no means moot. To deny review is tantamount to depriving petitioner of the right to any relief.

In his first issue petitioner alleges the Youth Court erred in denying the assistance of available counsel to him in a predetention hearing. He directs our attention to one of the express purposes of the Montana Youth Court Act:

> "(4) to provide judicial procedures in which the parties are assured a fair hearing and recognition and enforcement of their constitutional and statutory rights." Section 10-1202(4), R.C.M. 1947.

We hold the facts of this case do not demonstrate a violation of this statute. Initially, there is considerable doubt as to the status of William J. Miele, the Legal Services

- 8 -

attorney, in representing the youth at the time he appeared during the progress of the hearing before the Youth Court judge. The affidavit of the youth probation officer indicates that upon taking the youth into custody, <u>the youth stated that he was not represented by counsel</u> in response to a question by the youth probation officer. The affidavit of Mr. Miele indicates that on the day before the youth was taken into custody, the youth contacted him and asked him to represent him if criminal charges were filed against him for possession of stolen property and "I told Eugene that I would do so <u>if he was unable to obtain another attorney</u>." (Emphasis added.) It appears from the affidavit of Daniel Lovell that he was the moving force behind securing Mr. Miele's services in representing the youth. While it is true there are other affidavits and statements that indicate Mr. Miele was representing the youth, they do no more than create some doubt as to Mr. Miele's status at the time he entered the hearing then in progress.

Under the facts here, we hold there was no proven violation of the Montana Youth Court Act. We perceive no requirement in the Act that a predetention hearing be held under all circumstances. The Act simply requires the following circumstances to exist to authorize detention:

> "A youth taken into custody shall not be detained prior to the hearing on the petition except when: his detention or care is required to protect the person or property of others or of the youth; he may abscond or be removed from the jurisdiction of the court; he has no parent, guardian, or other person able to provide supervision and care for him and return him to the court when required; or an order for his detention has been made by the court pursuant to this act." Section 10-1212, R.C.M. 1947.

- 9 -

These requirements were clearly met by information developed from the youth probation officer under oath and his written report to the court followed by an order of the Youth Court for the youth's detention.

The second issue for review is whether the Youth Court failed to follow the statutory procedures and requirements of the Montana Youth Court Act in holding the youth in detention over the weekend prior to hearing the charges against him.

Petitioner points out the declared purpose of the Youth Court Act is to retain the youth in a family environment whenever possible, separating the youth from his parents only for the welfare of the youth or the safety and protection of the community. Section 10-1202(3), R.C.M. 1947. Petitioner also points out that this Court has heretofore set out the following criteria for separating a youth from his family environment: (1) necessary for the welfare of the youth, or (2) the safety or protection of the community. In the Matter of Zip Geary, _____Mont._____, 562 P.2d 821, 34 St.Rep. 218 (1977).

In our view, Geary is distinguishable and inapplicable on the basis that there, unlike here, the youth was being separated from his parents. Additionally, here the district court made an express finding "there is no home or institution in which said youth can be temporarily detained pending further proceedings" and the youth probation officer's report indicated the youth, in his opinion, might abscond if not detained.

In summary, we are of the opinion the Montana Youth Court Act does not require a judge to hold a predetention hearing in every case; that the judge did so here is a matter within his discretion. While it can be argued that the Youth Court

judge should have listened to Miele prior to entry of the order for prehearing detention, it appears that in view of Mr. Miele's questionable status as the youth's attorney the Youth Court judge was not compelled to do so. The predetention hearing developed a strong factual basis for detention of the youth in the juvenile facility in the Custer County jail under section 10-1212, R.C.M. 1947.

We hold the Youth Court judge did not violate the provisions of the Montana Youth Court Act in ordering detention of the youth under the circumstances involved in this case.

This opinion shall constitute a declaratory judgment concerning the rights and remedies of the petitioner under the circumstances of this case.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices.

Mr. Justice Daniel J. Shea dissenting:

As an abstract conclusion, I agree with the basic conclusion of the majority that the Youth Court is not required to give a youth a predetention hearing under all circumstances. But I cannot accept this conclusion applying to the facts of this case.

In this case the Youth Court did hold a predetention hearing. However, it was devoid of those procedural rights which usually go with a hearing. In essence, all the Youth Court did was accept the affidavit of the probation officer and his testimony concerning the youth and used this as a basis for jailing the youth for a period of not to exceed five days pending further juvenile proceedings. The probation officer was not cross-examined, the youth was denied the right to have anyone testify in his behalf, and he was effectively denied the right to an attorney at the hearing. The effect of this Court's decision is two-fold. First, a Youth Court is not required to hold a hearing. Second, even if a Youth Court does hold a hearing, there are no procedural requirements to make it a meaningful hearing.

Once the Youth Court judge chose to hold a predetention hearing, he committed himself, I believe, to holding a meaningful hearing. This would include the right of the youth to call witnesses in his behalf, to cross-examine witnesses, and to have a lawyer represent him.

Concerning the right to an attorney, the majority opinion makes much of the fact that the status of Mr. Miele as the youth's attorney was in doubt. The majority states the youth told the probation officer he did not have an attorney and that attorney Miele himself never directly represented to the court that he represented the Marten youth. If there was doubt, it was doubt caused by the probation officer and the court.

-12-

The probation officer knew attorney Miele was involved in the case and could well be representing the Marten youth. While still in Forsyth (Rosebud County), attorney Miele called the probation officer and told him he might be filing a habeas corpus petition in an attempt to get the youth released. Shortly thereafter, without notifying the attorney, the probation officer took the youth to Miles City (Custer County) some 45 miles from Forsyth. The probation officer might have had the best of intentions toward the youth in taking him to Miles City, but he should have notified the attorney of his intentions. When the attorney learned that the youth had been taken to Miles City, he was understandably concerned, and he, along with a social worker, immediately drove to Miles City. When they arrived they met an antagonistic judge and probation officer who had no intention of letting the attorney or social worker participate in the hearing.

The record clearly shows the court was not interested in what attorney Miele or the social worker had to say concerning whether the Marten youth could safely be released from custody pending the filing of a juvenile delinquency petition. These people traveled more than 45 miles, absolutely to no avail.

When attorney Miele asked to be heard the least the Youth Court could have done was to stop proceedings to allow a determination of whether attorney Miele was authorized to and did in fact represent the Marten youth. Furthermore, the Youth Court could then also have been informed that the social worker was available to testify to the home situation of the Marten youth and that there was a home where the youth could stay pending further proceedings on a delinquency petition.

Concerning the attitude of attorney Miele, this Court relies on the response filed in this Court to the youth's petition for a writ of supervisory control. I fail to see that it has any value

-13-

in proving that Miele's attitude was wrong. The trial judge's statements in this regard show that any information he had concerning attorney Miele was hearsay evidence related to him through the probation officers. While the record shows that attorney Miele and the probation officers have had previous confrontations, there is no way we can conclude that attorney Miele was in the wrong. Is it possible that the real problem is the attitude not of attorney Miele but that of the Youth Court and probation officer? Could it be that the court and probation officers would allow attorney Miele to represent youths only if he did it their way?

In summary I do not feel that this Court should put its stamp of approval on the hearing that was conducted in this case.

_____
Justice